R. R. RICOU, DOUGLAS RICOU AND ERNEST RICOU, CO-PARTNERS DOING BUSINESS AS RICOU FISH COMPANY, *Appellants*, v. JOHN G. CROSLAND, P. A. DAMPIER, R. G. OLMS, JOHN H. CUNNINGHAM AND M. DOUGLAS FLATTERY, AS TRUSTEES FOR MIAMI FISH COWPANY, A CORPORATION, *Appellees*.

Opinion Filed April 21, 1921.

A contract between a partnership and a corporation which is entered into between them for the purpose of preventing or lessening competition in any commodity which is the subject of commerce or trade, or to increase or reduce the price of merchandise, produce or other commodities is, under the provisions of Chapter 6933, Acts of 1915, void and not enforceable in law or equity.

An Appeal from the Circuit Court for Dade County; H. Pierre Branning, Judge.

Order reversed.

*Hudson, Wolfe & Cason*, for Appellants;

*Price & Price*, for Appellees.

ELLIS, J.—This is an appeal from an order overruling a demurrer to a bill in equity brought by J. G. Crosland and others as trustees for the Miami Fish Company, a corporation, against R. R. Ricou and others, a co-partnership doing business as Ricou Fish Company, for an accounting in a matter resulting from an alleged agreement between the parties whereby they agreed to combine their respective interests in the fishing business at Miami and Key West. The bill alleged that the Ricou

Fish Company was engaged in the fish business in Miami and Key West, and that the Miami Fish Company was engaged in the fish business in Miami. That in August, 1917, the copartnership and the corporation verbally agreed that for the fishing season of 1917 and 1918 they would "combine their interests" at Miami and Key West, "which interest consisted of all mullet, mackerel, blue fish, pompano and king mackerel which may be obtained or produced or shipped" by the Miami Fish Company and the Ricou Fish Company at "Miami or Key West or both such places, whether said fish were caught by the corporation or the partnership or any persons in their employment, or in any manner purchased or handled by them, and after deducting "set expenses" then agreed upon, the profits should be equally divided between the parties, and the losses sustained should be equally borne. That the Miami Fish Company in October, 1917, reduced to writing its understanding of this agreement and forwarded it to the Ricou Fish Company in the form of a letter, which was received by the latter company and its terms agreed to. The letter was an amplification of the verbal agreement as the same was set out in the bill. That is to say, it was an explanation of the term "combine their interests" as used in the bill respecting the verbal agreement. According to the agreement as explained by the letter, the proceeds of the sale of all fish such as mentioned, whether produced or shipped by the corporation or the partnership, were to be equally divided between them, after the "set expenses" were deducted. A method was agreed upon for fixing the price on all fish, by starting with an arbitrary base for such price. It was agreed that this so-called base for a price to be charged for the fish, consisted of the amount per pound which the company or partnership paid the

fishermen plus two cents per pound for expenses in hand-
ling certain kinds of fish, and one cent per pound for hand-
ling another kind. The Miami Fish Company was to sell
all mullet delivered or shipped from Miami, whether caught
by that company or the Ricou Fish Company, and the
latter company was to have "full and entire charge of all
mackerel, blue fish, pampano, and in fact any kind of fish
shipped from Key West." The Miami Fish Company
was to have no "voice in handling this matter unless
called upon by the Ricou Fish Company," in which case
no charge was to be made for the service. Regarding
king mackerel it was agreed that the "bulk of these fish"
should be handled from Miami, and each "firm" would
be allowed 1 cent per pound for "packing expenses" of
such fish over the cost price to fishermen. The parties
were to lend each other boats without charge. There
were some provisions relating to the business of the R. R.
Ricou & Sons at Jensen, and the Miami Fish Company's
retail fish business and "hotel orders" which were not
to "go into this pool."

Here was an effort by a corporation on the one hand,
and a copartnership on the other, by combining their
interests in the fish business at Miami and Key West to
further the common adventure in buying and selling fish
and manipulating the market price so far as possible of
that commodity. It was a combination between com-
peting houses for the control of the fish business at the
two ports named.

The demurrer to the bill was overruled. It attacked
the bill upon many grounds: First, that it was without
equity; that there was an adequate remedy at law; that
the contract was *ultra vires* as to the Miami Fish Com-
pany because it was an effort to form a partnership with

another; that the contract was against public policy as tending to produce a monopoly in the fish business at Miami and Key West and in restraint of trade; that the contract terms were so vague that they were incapable of enforcement; that there was no consideration upon which the agreement rested; want of mutuality and lack of consideration.

The bill alleged that the profits derived from handling of mullet for the season of 1917, ending November 20th of that year, had not been divided between the parties to the agreement. That the Miami Fish Company had complied with the terms of the agreement; that it had made monthly reports of all fish sold, the invoice value of them, and the amounts received, profits made and loss sustained on each shipment, but that the Ricou Fish Company refuses to account for the fish handled by it. It was alleged that an accounting would show the Ricou Fish Company to be indebted to the Miami Fish Company in the sum of approximately twenty-five thousand dollars.

The purpose of the agreement, as disclosed by the letter of the Miami Fish Company, seems to have been to remove from the port of Miami its principal competitor in the matter of the sale of a certain kind of fish, and to eliminate itself as a competitor of its rival in the waters of Key West. And after establishing a monopoly of the fish selling business at each place, so far as it could be done by the agreement to divide the profits and share the losses of the undertaking. By this agreement they undertook not only to control the selling price of the fish called mullet by agreeing to an arbitrary allowance to themselves as the cost per pound for expense in handling the fish, thus attempting to fix an arbitrary base for a

selling price, but agreed upon the price to be paid to the
"fishmen" during October and November. By the use of
the term "fishmen" in the letter of explanation, we sup-
pose the parties to the agreement referred to those fisher-
men who go out to the fishing grounds in small boats
and bring in their "catch" to be disposed of by sale to
one of the fish companies, which in turn packs the fish
and prepares them for the open market. These com-
panies appear to occupy the position of "middlemen" in·
the fish business between producer and consumer. How-
ever important a factor in the fish business they may be,
preparing the commodity for the market and providing
an avenue or channel through which the supply may be
carried to the consumer, the fact remains that they con-
stitute one of the channels of trade, they supply a market
for the small fisherman who finds in them purchasers for
his "catch," and to whom he looks to sell the products of
his days and nights of labor which is rewarded accord-
ing to the demand when he brings in his catch. When
two or more rival "middlemen" enter into a contract by
which they propose to "pool their interests" to the end
that both demand and price, from the standpoint of the
producer, may be controlled, they violate both the spirit
and letter of the law of Florida as expressed in Chapter
6933, Laws of Florida, 1915. See Weidman v. Shragge,
46 Can. Sup. Ct. 1, Ann. Cas. 1912D, 919; Nester v. Con-
tinental Brewing Co., 161 Pa. St., 473, 29 Atl. Rep. 102.

Counsel for appellees contend that the agreement can
only be construed to be in partial and not general
restraint of trade as a reasonable agreement having for
its object a benefit to the parties, but no injury to the
public, although in its operation it might be effective to
restrain trade in the fish business in some degree. That

at most the agreement was in reasonable restraint of competition, but not in restraint of trade.

The substance of this doctrine is laid down in Mitchel v. Reynolds, 1 Peere Williams' Rep. 181. See also 27 Laws of England (Halsbury) 550.

But under such rule the requisites of a valid restraint were reasonableness, good consideration and definiteness of terms. The agreement was considered in its entirety and its reasonableness depended upon the consideration of its necessity for the protection of the interests of the covenantee.

Our view of the contract is that its obvious purpose was to prevent or lessen competition in the commodity in which the two companies dealt to the injury of the producers and consumers, and which was the subject of commerce or trade at the two ports, and was therefore in violation of the act above mentioned and void. The demurrer should therefore have been sustained.

The order is reversed, with directions to sustain the demurrer and dismiss the bill.

TAYLOR AND WEST, J. J., concur.

BROWNE, C. J., AND WHITFIELD, J., dissent.

BROWNE, C. J., dissenting.

I cannot find in the agreement that is the basis of this suit anything to indicate an attempt in anywise to control either the demand for, or the price of the fish that was the subject of the agreement. The situation presented appears to be this: The Ricou Fish Company

and the Miami Fish Company were engaged in catching
from their own boats, and in buying from other boats,
mullet, mackerel, blue fish, pompano, grouper and snap-
per and other bottom fish.    The Ricou Fish Company
operated plants at Jenson, Key West and Miami; the
Miami Company operated at Miami.    The agreement with
regard to handling the fish was that the Miami Fish Co.
was "to sell all mullet caught by either of the firms that
is delivered or shipped from Miami," and the Ricou Fish
company was to "have full and entire charge of all mac-
kerel, blue fish, pompano, or in fact any kind of fish
shipped from Key West."    The bulk of the king mackerel
was to be handled from Miami.    The profits made by the
Miami Fish Company or the Ricou Fish Company from
the sale of mullet, mackerel, blue fish, pompano and king
mackerel, after deducting set expenses, were to be divided
equally between the two companies.

The original agreement was a verbal one, under which
the parties operated for three months, but on October
30th the contract was reduced to writing in the form of
a letter written by the Miami Fish Company reciting the
verbal agreement, and an acceptance by the Ricou Co.
of all the terms, conditions, statements and agreements
set forth in the letter.    The agreement recites that the
price of mullet in August was 2c per pound, the price in
September was 2½c per pound, and during October 3¾c
per pound.    These relate to past transactions, and cannot
be construed to be price fixing agreements.    The price
on mullet caught in October and November "will be 3¾c
per pound, with the exception of gillnet mullet caught
at Cape Sable.    They are to be the price paid at Cape
Sable."

With regard to bottom fish it was stipulated "if, how-
ever, from now on, there should be any quantity of bot-

tom fish caught, the price can be adjusted in the following manner: the price we pay to the fishmen plus 1c per pound for expense."

With regard to other varieties of fish, the contract provides:

"The season is now beginning for blue fish, Spanish mackerel and pompano, and the price on the following fish will be based on what we have to pay the fishmen plus 2c per pound for expense; for instance, if we have to pay 6c per pound at Bahahunda for mackerel, whichever company does the work will be allowed 2c per pound for the expense of running and packing these fish, furnishing ice, gas, labor, run boats and any other expense connected with it. This will apply to mackerel, blue fish and pompano caught with purse seines and delivered either at Miami or Key West, and we will base the purchase price of purse seine mackerel on price we have to pay at Bahahunda.

"In basing a price on Spanish mackerel, blue fish and pompano and other fish, we do so at the price paid the fisherman who owns his own gear. Any boats and nets that we advance to fishermen of our own we are at liberty to make any private deal with the captain that we see fit, and the fish will be turned in to either company at the same price that we would pay an independent fisherman."

Both companies had, or expected to have some boats and nets of their own engaged in fishing, and it was stipulated that the price paid for fish caught from boats operated by either of the companies was to be controlled by the price paid in the open market to the independent fisherman. It appears that each of these companies owned or controlled boats that were better adapted to

the needs of the other than to itself, and it was stipulated that the Miami Company should loan the Ricou Company free of charge its auxiliary schooner Columbia and gasoline boat Bloxam, and the Ricou Company was to loan the Miami Company free of charge the auxiliary schooner Hope.

The main purpose of this agreement was to have all the fish of one variety handled by one of the companies, and the other varieties by the other company.

Neither the bill nor the contract discloses the reason for handling the fish in this manner, but it might well have been that each company had customers and markets for the respective varieties it was to handle and by this system planned to reduce the expenses incident to advertising and finding new customers and markets, and of maintaining and operating the extra plant at Key West.

The assumption that the Ricou Fish Co. and the Miami Fish Co. were the only persons, corporations or firms engaged in the fish business at Key West and Miami, and that therefore the combination of these two was in restraint of competition or in restraint of trade, or created a partial monopoly by eliminating all competition in the purchase of fish from independent fishermen, does not find support in the record, as I read it.

The mullet business had been carried on for nearly three months under the verbal agreement, and the reference in the written contract to the price of mullet was the actual price paid during the months of August, September and October. Each of these companies was engaged in the business of catching fish from its own boats, and in addition to this they bought fish in the open market and merely agreed between themselves that in adjusting

their accounts each would be allowed to charge the other the price paid the fishermen, plus a certain amount to be allowed for the expense of running and packing this fish, furnishing ice, gas and labor, running boats and any other expense connected with it.

Nowhere in the contract, so far as I can see, is there any attempt to control the price that was to be paid to the independent fishermen; or to prevent or lessen competition in the commodity in which the two companies dealt to the injury of the producer and consumer. On the contrary, cutting down overhead expenses; eliminating the expense of opening two plants at Key West where but one was needed; adopting a more efficient system of marketing by letting each firm handle the varieties of fish it was best capable or best prepared to market advantageously, tended to reduce the cost to the consumer, and benefit, rather than injure, him.

Holding these views, I am forced to dissent.

WHITFIELD, J., concurs in this dissent.